UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 22-010-DCR-1 |
| | ) | |
| V. | ) | |
| | ) | |
| JE'VON BYRD, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

Defendant Je'Von Byrd has moved to suppress all the evidence seized from his person and from the car in which he was a passenger on the date of his arrest.  [Record No. 22]  The motion was referred to United States Magistrate Judge Matthew A. Stinnett for preparation of a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  An evidentiary hearing was conducted on April 25, 2022, and Magistrate Judge Stinnett issued his report on April 29, 2022, recommending that the Court deny the motion on all grounds.  [Record No. 35, p. 1]

Byrd filed four separate objections to the Report and Recommendation.[1]  [Record No. 39]  However, after conducting a *de novo* review of the issues raised by the defendant, the undersigned agrees with the magistrate judge's assessment.  Byrd's objections will be overruled, and his motion will be denied.

---

[1]    To the extent Byrd did not specifically object to Magistrate Judge Stinnett's Report and Recommendation, the Court finds its reasoning persuasive and adopts it in this Memorandum Opinion and Order by reference.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings.").

**I.**

On March 27, 2021, officers with the Lexington Police Department ("LPD") responded to a suspected narcotics overdose at a residence in Lexington, Kentucky.  [Record No. 34, p. 6]  LPD Narcotics Detective David Todd Hard ("Detective Hart") arrived at the scene following the removal of the victim and made contact with another individual at the residence. After being advised of his *Miranda* rights, the individual (hereafter, "CS") admitted to Detective Hart that the officers would find trafficking-level quantities of narcotics on the premise and agreed to assist law enforcement in their investigation.[2]  [*Id.*, p. 6–7]

CS informed Detective Hart that his supply of narcotics came from a man known to him as "Bird".  [*Id.*, p. 7]  CS then identified two vehicles, a phone number, and a residence associated with "Bird".  [*Id.*, p. 8]  CS further described the two vehicles as a blue Ford Explorer—ordinarily used by "Bird" as a drug trafficking vehicle—and a silver Chrysler 300 used by "Bird's" romantic partner and the mother of his children.  [*Id.*, p. 8–9] CS reported that "Bird's" partner was a white, blonde-haired female named "Savannah."  [*Id.*, p. 9] CS went on to provide license plate numbers for the vehicles and described the residence as "a white house on the right as you enter the court with a large tree in front of it" located at 365 Woodview Drive in Lexington.  [*Id.*]

After locating the residence at the address provided by CS, Detective Hart surveilled the area.  [*Id.*, p. 38] The residence fit CS' description and the two vehicles specifically described by CS were located in the driveway.  [*Id.*, p. 38–40]  Detective Hart ran a check of

---

[2]     The identity of CS is known only to law enforcement.  Although the gender of CS is unknown, the Court uses masculine pronouns for ease and consistency.

the vehicles' license plates and discovered that they were registered to a "Michael Byrd."[3] [*Id.*, p. 10]  Detective Hart also observed individuals fitting CS' descriptions of "Bird" and his partner entering and exiting the residence with children's car seats.  [*Id.*, p. 39]  Later, CS identified a driver's license photograph of Michael Byrd as his source of supply and used the phone number previously provided to Detective Hart to arrange a controlled purchase of a large quantity of fentanyl.  [*Id.*, p. 12–15]

Coordinating with CS, Michael Byrd agreed to meet at Apartment 42 at 1100 Horseman's Lane in Lexington.  [*Id.*, p. 13–14] At the agreed-upon date and time, law enforcement units went to the location with CS in anticipation of intercepting Michael Byrd. [*Id.*, p. 14]  On arrival, officers observed a white male in a red shirt park outside and enter Apartment 42.  [*Id.*, p. 15–16]  CS identified this individual as "John John," a drug courier for Michael Byrd.  [*Id.*, p. 17]  "John John" remained inside and was observed walking around, while the officers on site communicated remotely sharing emerging details.

Contemporaneous with these observations, investigators utilized CS to maintain contact with Michael Byrd.  Eventually, the suspect advised that he was approximately five minutes away from the meeting location.  [*Id.*]  Within fifteen minutes, the blue Ford Explorer arrived and parked in front of Apartment 42.  A smaller grey sedan also arrived alongside the

---

[3]     Based on the available record, it is not entirely clear whether the plate numbers provided by CS matched those observed and checked by Detective Hart.  Defense counsel asserts that Detective Hart misstated the Explorer's plate number throughout an investigative report.  [Record No. 34, p. 28, 33]  However, Detective Hart credibly testified that he believed this to be a mere typographical error.  [*Id.*, p. 33–34]  Regardless, the make and model of the vehicles and the appearance of the residence matched CS' information, and the vehicle was registered to Michael Byrd.  [*Id.*, p. 40] Moreover, the number run by Detective Hart through the database matched the license number of the Explorer that arrived on the scene of Defendant Byrd's eventual arrest.  [*Id.*, p. 28]

Explorer and parked just a few spots away.  [*Id.*, p. 18–19]  At this point, law enforcement units prepared to make contact with the vehicles and intercept any narcotics contained therein. [*Id.*, 18–20]

Beginning the operation, multiple units approached and secured the two vehicles' occupants.  LPD Detective Elizabeth Thomas ("Detective Thomas") secured the driver of the Explorer, later identified as Wesley Reed ("Reed").  [*Id.*, p. 56] Meanwhile, LPD Detective Brandon Hazelwood ("Detective Hazelwood") approached the passenger side of the vehicle and observed an individual—later identified as the movant and Defendant Je'Von Byrd— sitting in the front passenger seat.  [*Id.*, p. 43–44; Gov. Ex. 1 (Hazelwood Body-Worn Camera)] Detective Hazelwood testified that he believed Defendant Byrd was reaching for a weapon, and he repeatedly commanded Byrd to keep his hands visible and not reach for any items.  The camera footage illustrates that Byrd ultimately complied and placed his hands on the interior roof.  [Gov. Ex. 1]

As Detective Hazelwood was issuing verbal commands, Detective Thomas came around to the passenger side door.  When she opened the door, Detective Thomas immediately observed a handgun plainly visible in Byrd's pocket.  She directed the defendant not to reach for it.  At the same time, Byrd voluntarily admitted that he had a firearm.  [Record No. 34, p. 56–58] Detective Thomas retrieved the firearm and commanded Byrd to exit the vehicle.  She then placed the defendant in handcuffs and proceeded to conduct a weapons pat down to ensure that he had no additional weapons.  [*Id.*, p. 58–59] During this check, Detective Thomas clearly felt a long, rectangular object inside of Byrd's jeans and near his waistband.  She immediately—and correctly—suspected that this object was a "brick" of illegal narcotics.  [*Id.*, p. 59]

When questioned about the item, Byrd repeatedly insisted that it was his genitalia. [*Id.*] Accordingly, Detective Thomas enlisted Detective Ross Collins ("Detective Collins"), to search Byrd's person. Detective Collins quickly located the brick of suspected narcotics inside Byrd's pants. [*Id.*, p. 59–62] Footage from Detective Collins' body-worn camera confirms that, at this point, officers immediately read Byrd his *Miranda* rights before continuing with a full search of his person. [Gov. Ex. 3]

Afterwards, while Reed, Defendant Byrd, and Michael Byrd—who had been occupying the grey sedan—remained detained by police outside the vehicles, officers searched the Explorer. Based on CS's statements, the controlled purchase, and the drugs found on Byrd's person, they reasonably believed that the vehicle would contain a quantity of narcotics. Inside, officers located approximately seven kilograms of suspected fentanyl in a backpack in the rear passenger seat. [*Id.*, p. 68–71] Based on all the foregoing evidence, officers obtained and executed a state search warrant for Apartment 42 and located additional drugs and other evidence of drug trafficking offenses. [*Id.*, p. 75; Gov. Ex. 5 (Search Warrant)]

## II.

Byrd's contends that: (i) CS was not reliable and, thus, officers were not entitled to rely on information he provided to perform an investigatory stop; (ii) the investigatory stop was performed in the absence of specific and articulable facts giving rise to reasonable suspicion; (iii) Byrd was not under arrest at the time the fentanyl was found in his pants and, therefore, the search incident to arrest exception does not apply; and (iv) because CS was unreliable, any evidence flowing from reliance on the information he provided constitutes fruit of the poisonous tree. [Record No. 39] As discussed herein, each objection is unavailing.

An officer may conduct an investigatory stop if he has a reasonable suspicion that criminal activity is afoot. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002). Reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence" standard, but the officer *must* "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000). In assessing whether reasonable suspicion existed at the time the stop commenced, the reviewing Court considers to totality of the circumstances. *O'Malley v. City of Flint*, 652 F.3d 662, 670 (6th Cir. 2011).

Here, Magistrate Judge Stinnett correctly concluded that sufficient reasonable suspicion existed to conduct an investigatory stop of the Explorer and its occupants on the night in question. The information provided by CS and independently corroborated by law enforcement provided the officers with "specific and articulable facts" warranting the stop. *Terry*, 392 U.S. at 21.

### 1.      The Reliability of CS

Byrd contends that CS was an unreliable source and, as a result, the officers were not entitled to rely on information he provided to establish reasonable suspicion supporting the stop. [Record No. 39, p. 1–3] Information obtained from an informant may furnish the necessary reasonable suspicion to justify an investigatory stop. *United States v. Keeling*, 783 F. App'x 517, 521 (6th Cir. 2019) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)). However, the Court must ascertain the informant's veracity, reliability, and basis of knowledge in determining whether the officers were entitled to rely on their tips as accurate. *Id.* Whether the informant is known to law enforcement and whether his information has been corroborated

are two factors the Court may consider in making this determination.  *Id.*; *see also United States v. Smith*, 182 F.3 473, 478 (6th Cir. 1999).

As Magistrate Judge Stinnett comprehensively demonstrated, CS and the information he provided was sufficiently reliable to establish reasonable suspicion justifying the investigatory stop.  [Record No. 35, p. 10–14]  Although CS was not *previously* known to law enforcement, he was not anonymous during the investigation.  [Record No. 34, p. 6–7]; *see Keeling*, 783 F. App'x at 521 (citing *United States v. May*, 399 F.3d 817, 823 (6th Cir. 2005)) (calling for consideration of whether the informant was known or anonymous).  CS also made several inculpatory statements and allowed police to monitor his communications with Michael Byrd in arranging the controlled purchase, confirming his assertion that Michael Byrd was his narcotics supplier.  [Record No. 34, p. 7–8, 12–13, 17–18]; *see United States v. Dickens*, 748 F. App'x 31, 38 (6th Cir. 2018) (holding that an informant's reliability was sufficiently established by her statements against her own penal interest as well as statements made during a telephone call with the defendant confirming the informant's information).

Further, Detective Hart's independent investigation corroborated key details of the information CS provided.  *See Keeling*, 783 F. App'x at 521 (citing *Smith*, 182 F.3d at 478) (acknowledging that subsequent corroboration of an informant's information supports their reliability).  He located the Woodview residence identified by CS, which appeared as CS described.  [Record No. 34, p. 38] And Hart further observed two vehicles matching the precise make, model, and color provided by CS of vehicles associated with Michael Byrd.  [*Id.*, p. 39] Upon running a registration check, the vehicles returned to a "Michael Byrd," further confirming CS' information.  [*Id.*, p. 10] Detective Hart also observed two individuals, one matching the description of Michael Byrd's romantic partner, entering and exiting the

residence with car seats. [*Id.*, p. 38–39] This independent observation confirmed CS' information concerning Michael Byrd's partner and young children.

Finally—and most importantly—CS' accurate predictions regarding Michael Byrd's and his associates' actions on the night in question confirm the reliability of the information provided by CS. *See Alabama v. White*, 496 U.S. 325, 332 (1990) (noting that the most valuable corroborative information relates to the future actions of third parties). CS reliably predicted that Michael Byrd (and perhaps others) would travel to Apartment 42 at the agreed time in or with the Explorer. Officers were entitled to rely on this information. *See id.* (concluding that an informant was sufficiently reliable in large part because the informant accurately predicted that the target would drive to a particular location in a particular vehicle at a particular time). Taken together, the evidence supports Magistrate Judge Stinnett's conclusions that CS was sufficiently reliable and that his information provided law enforcement with "specific and articulable facts" justifying the investigatory stop. [Record No. 35, p. 13 (concluding that investigators established the veracity, accuracy, and reliability of CS before engaging in the investigatory stop based on his information)]; *Terry*, 392 U.S. at 21.

Arguing against these conclusions, Byrd points to a host of purported issues that he believes weakens CS' reliability. [Record No. 39, p. 1–3] These issues include: (i) the license plate number listed in Detective Hart's report did not match the one on the Explorer; (ii) police did not surveille 1100 Horseman's Lane or Michael Byrd's Louisville address before the night of the arrest; (iii) CS did not "name[] or [speak] of" "John John" before he appeared at Apartment 42; (iv) CS was not asked to identify Michael or Je'Von Byrd at the scene; (v) CS never mentioned the grey sedan that accompanied the Explorer on the night in question; (vi)

CS never referenced Je'Von Byrd; (vii) police were looking for Michael Byrd but arrested Je'Von; and (viii) CS had not previously worked with the police.  [*Id.*]

None of these contentions are sufficient to overcome the Court's conclusion outlined above.  And many are simply not material to the issue of CS' reliability.  Instead, they either relate to events that occurred *after* the investigatory stop (such as the arrest of Je'Von Byrd), or to alleged deficiencies in *law enforcement's* conduct (such as the failure to ask CS to identify Michael or Je'Von Byrd at the scene).  With regard to other contentions, such as CS' failure to reference "John John" or the grey sedan, the Court simply notes that an informant does not have to be prescient nor omniscient to be reliable.  *See Gates*, 462 U.S. at 233–34; *White*, 496 U.S. at 331.

### 2.     The General Propriety of the Investigatory Stop

Although Byrd captions his second objection "The Terry Patdown," this argument is actually directed at the propriety of the investigatory stop.  [Record No. 39, p. 3–4] Specifically, the defendant argues that "detectives had been pre-advised that they were to contain and make contact [with the occupants of the Explorer] *without regard to whether there were any specific and articulable facts giving rise to reasonable suspicion*."  [*Id.*, p. 3 (emphasis added)] But this contention is incorrect.

Officers were advised to make contact specifically *because* they already had "specific and articulable facts" that reasonably led them to believe the occupants of the Explorer were engaged in narcotics trafficking.  *Terry*, 392 U.S. at 21.  These facts included the reliable information provided by CS regarding Michael Byrd (his own source of narcotics supply), the type of vehicle driven by Michael Byrd, and the controlled purchase.  This information easily clears the reasonable suspicion barrier and provided the police a proper basis for initiating the

- 9 -

investigatory stop when the Explorer arrived. *See Hurst*, 228 F.3d at 757 (noting that reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence" standard).

Byrd further argues that the facts here are similar to those presented in *United States v. Ceballos*, 654 F.2d 177 (2d Cir. 1981), and urges the Court to follow the Second Circuit's reasoning in suppressing the evidence obtained by law enforcement. [Record No. 39, p. 4] However, the defendant neither raised this argument in his initial motion nor during the hearing before Magistrate Judge Stinnett. [*See* Record Nos. 22 & 34.] Thus, it is waived. *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000) (holding that a party is not permitted to raise a new argument for the first time in objection to a Report and Recommendation, and that failure to raise the issue before the magistrate judge constitutes a waiver).

### 3.    The Pat Down and Searches Incident to Arrest

Byrd's next objection appears to be based on a misunderstanding of the magistrate judge's Report and Recommendation. It begins with the proposition that "the Report & Recommendation states that J. Byrd was under formal arrest *at the time the fentanyl was found in his pants*." [Record No. 39, p. 4 (emphasis added)] And it concludes by objecting to "the recommended finding that [Je'Von Byrd] was under formal arrest and . . . to the recommendation that the *Gant* search incident to arrest exception applies." [*Id.*] However, the Court agrees with the magistrate judge's findings on both issues.

### a.    The Protective Pat Down, Arrest, and Search of Byrd

Contrary to Byrd's assertion, Magistrate Judge Stinnett did *not* state that Byrd was under formal arrest at the moment the fentanyl was found in his pants. [*See* Record No. 35, p. 14–21.] Instead, the Report and Recommendation makes clear that Byrd was not under formal

arrest until *after* the fentanyl was discovered.  [*Id.*, p. 20]  At the time the fentanyl was found, officers were merely engaged in a constitutionally-permissible pat down of Byrd to locate possible weapons.

"To justify a pat down of the driver or a passenger during a traffic stop . . . police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).  Much like in the *Terry* stop context, this means that officers must have "a particularized and objective basis for suspecting [that] the particular person is armed and dangerous."  *United States v. Noble*, 762 F.3d 509, 522 (6th Cir. 2014) (quotation marks omitted).

The record amply demonstrates that Detective Thomas had a particularized and objectively reasonable basis for suspecting that Byrd was armed and dangerous at the time she conducted the pat down.  *See Noble*, 762 F.3d at 522.  First, officers had sufficient and reasonable grounds to believe that the Explorer and its occupants would be arriving with a large quantity of narcotics as part of a sophisticated drug trafficking operation.  This fact, combined with officers' training and experience with criminal organizations, reasonably indicated a likelihood that occupants of the vehicle would be armed.  *See Noble*, 762 F.3d at 524.  Second, Detectives Thomas and Hazelwood both testified that, based on Byrd's hand movements as they approached the vehicle, they believed he was reaching for a weapon. [Record No. 34, p. 44, 56–57] Third, and importantly, Detective Thomas retrieved a loaded firearm from Byrd's pocket immediately before conducting the pat down for additional

weapons. [*Id.*, p. 56–57] In short, the officers had reasonable suspicion that Byrd was armed and dangerous, and thus the pat down was proper.[4] *Johnson*, 555 U.S. at 327.

It was during this pat down that Detective Thomas plainly felt the apparent brick of narcotics in Byrd's pants. [Record No. 34, p. 59] "During a protective pat down, an officer does not need to ignore contraband should any be discovered." *United States v. Pacheco*, 841 F.3d 384, 394 (6th Cir. 2016). For the "plain feel" doctrine to apply, police must have lawfully been able to feel the object (i.e., during a permissible pat down) and the incriminating nature of the object must be immediately apparent to the officer. *Id.*; *see Minnesota v. Dickerson*, 508 U.S. 366, 375–76 (1993). These principles confirm that Detective Thomas' discovery of the fentanyl was constitutional. She located the object while conducting a lawful weapons pat down of Byrd, which gave her a right of access to his person. [Record No. 34, p. 59] And based on the feel of the object, the circumstances regarding the controlled purchase, and Detective Thomas' training and experience as a narcotics detective, it was immediately apparent to her that the item was a "brick" of narcotics. [*Id.*]

Contrary to Byrd's apparent misunderstanding, it was only at this time, *after* the fentanyl was lawfully discovered and retrieved from Byrd's pants, that he was placed under formal arrest. [Record No. 39, p. 4] Footage from Detective Collins' body-worn camera reveal

---

[4]    The fact that Byrd was handcuffed during the pat down does not change this conclusion. *See, e.g.*, *United States v. McCullough*, No. 1:12-CR-101, 2013 U.S. Dist. LEXIS 161411, at *9 (E.D. Tenn. Nov. 13, 2013) (finding that officers were justified in handcuffing the defendant and conducting a subsequent pat down after he indicated he had a weapon "based on a reasonable belief that Defendant might be armed and dangerous."); *United States v. Chandler*, No. 2:10-23-DCR, 2010 U.S. Dist. LEXIS 73199, at *8 (E.D. Ky. July 20, 2010), *aff'd*, 437 F. App'x 420 (6th Cir. 2011) (concluding that "it was reasonable to secure the Defendant with handcuffs to further examine his pockets for a weapon" after conducting an initial pat down and locating incriminating evidence).

officers immediately reading Byrd his *Miranda* rights upon discovery of the fentanyl and before continuing a full search of his person incident to his arrest.  Further, during that search Byrd indicated a desire to end the encounter, but police advised that they would continue to search him because they had just found a bunch of "dope" in his pants.  [Gov. Ex. 3 at 1:00-3:00 minutes].  And Byrd remained handcuffed and surrounded by officers the entire time following the discovery of the fentanyl in his pants, including when the Explorer was later searched.  These circumstances indicate that Byrd was formally arrested directly after the discovery of the fentanyl in his pants.  *See United States v. Burton*, No. 1:19CR110, 2019 U.S. Dist. LEXIS 121656, at *5 (N.D. Ohio July 19, 2019), *aff'd*, 828 F. App'x 290 (6th Cir. 2020) (discussing cases marking the bounds of formal arrest).  Accordingly, Byrd's objection "to the recommended finding that he was under formal arrest" will be overruled.[5]  [Record No. 39, p. 5]

### b.    The Search of the Explorer Incident to Byrd's Arrest

---

[5]     And even assuming that Byrd was not under formal arrest at that time, the subsequent full search of Byrd's person was still constitutionally permissible.  A search incident to an arrest permits an officer to conduct a full search of an arrestee's person *before* he is placed under lawful custodial arrest as long as "the formal arrest follows quickly on the heels of the challenged search . . . and the fruits of that search are not necessary to sustain the probable cause to arrest."  *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004).

Here, the probable cause for Byrd's arrest existed when the fentanyl was found in his pants—before the full search commenced or produced any fruits.  *See Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) (defining probable cause). Further, Byrd was indeed formally arrested that evening on state fentanyl trafficking charges.  [Record No. 16, p. 4] Accordingly, the search incident to arrest exception applies and renders constitutional the discovery of any further evidence found on Byrd's person regardless of when exactly Byrd was formally arrested.  *See Montgomery*, 377 F.3d at 586.

The latter half of this objection challenges the magistrate judge's conclusion that the *Gant* exception applies to law enforcement's search of the Explorer.[6]  [Record No. 39, p. 4]  In relevant part, the *Gant* exception states that "circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle."  *Arizona v. Gant*, 556 U.S. 332, 335 (2009).  A reasonable-to-believe standard appears to require less than probable cause and is likely closer to a reasonable suspicion standard required to justify a *Terry* stop.  *See, e.g.*, *United States v. Odoms*, No. 2:17-cr-10, 2018 U.S. Dist. LEXIS 96452, at *10 (S.D. Ohio June 8, 2018) (collecting cases).

As discussed above, the record suggests that Byrd was in police custody pursuant to a formal arrest at the time the Explorer was searched.  And based on the fentanyl that was found in Byrd's pants—triggering his formal arrest—it was reasonable for officers to believe that a search of the Explorer would reveal additional evidence of drug trafficking offenses. This is especially true in light of the officers' knowledge that the Explorer was expected to arrive at the location at that time to engage in a controlled narcotics transaction.  [*See* Record No. 34, p. 13–14, 18.]  The *Gant* exception properly applies to the search of the Explorer.  *Gant*, 556 U.S. at 335.

---

[6]      However, Byrd does *not* object to Magistrate Judge Stinnett's finding that the automobile exception to the warrant requirement alternatively and independently justifies the search of the Explorer.  [*See* Record No. 35, p. 24–25 (finding that the automobile exception justifies the search independently of the *Gant* exception); Record No. 39 (no objection to this finding).]  Accordingly, regardless of the outcome of this objection, the search of the Explorer is valid, and the evidence will not be suppressed.

4.        **Fruit of the Poisonous Tree**

Byrd contends that CS is "unreliable and thus any and all steps taken in reliance on [his] information were [] unconstitutional intrusion[s] on his rights." [Record No. 39, p. 5] He adds no further arguments, facts, or citations to support this bare assertion. [*See id.*] But for the reasons discussed above and more extensively within the magistrate judge's Report and Recommendation, the Court concludes that CS was a sufficiently reliable source.

Police were entitled to rely on information provided by CS as the "specific and articulable facts" justifying the investigatory stop. *Terry*, 392 U.S. at 21. That stop set in motion a chain of constitutionally permissible events culminating in the search of Byrd's person and the Explorer. The tree itself is not poisonous, and neither is its fruit. *See Colorado v. Spring*, 479 U.S. 564, 572 (1987).

### III.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.        United States Magistrate Judge Stinnett's Report and Recommendation [Record No. 35] is **ADOPTED IN FULL** and **INCORPORATED** here by reference.

2.        Defendant Je'Von Byrd's objections to the Report and Recommendation [Record No. 39] are **OVERRULED** and his motion to suppress [Record No. 22] is **DENIED**.

Dated: May 10, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky

- 15 -